UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIMBERLY NEWPORT, | : |
| Plaintiff, | : |
| v. | : Civil Action No. No. 10-CV-30095-MAP |
| NEW A.D.E., INC., ROBERT P. MILOS AND JOHN D. CONFORTI | : |
| Defendants. | : |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**I.     INTRODUCTION**

Kimberly Newport commenced this action against the defendants alleging that the defendants misclassified her as an independent contractor and, as a result, failed to pay her overtime wages and employee benefits during the approximately three years that she worked for defendants. According to the defendants in their Answer, Document No. 5, and at their depositions, Ms. Newport was hired as an independent consultant and was not hired as an employee and was therefore not entitled to employee wages and benefits.

A strong presumption exists under G.L. c. 149 § 148B that "an individual performing any service …shall be considered to be an employee" of the company for which he or she performs that service absent very specific circumstances or exceptions. No such circumstances exist here and, thus, the defendants' characterization of Ms. Newport as an independent consultant or non-employee contractor violates G.L. c. 149 §§ 148 and 148B. Ms. Newport should therefore be entitled to overtime pay as an employee and the value of any and all employee

benefits and perquisites that she did not receive because she was misclassified as a non-employee contractor. To remedy these violations, the plaintiff simply seeks to get paid the money she is owed, trebled, and attorney's fees and costs of suit to which she is entitled.

At this juncture, Ms. Newport requests that the Court find that she was an employee as a matter of law, grant summary judgment in her favor on all her claims and set this case down for a trial on damages.[1]

## II.   STATEMENT OF FACTS

New A.D.E. is located at 49 Garfield Street in Holyoke Massachusetts. (Secretary of State web page, attached to the Affidavit of Suzanne Garrow at attachment 1.) The company is a liquidation company for closeout merchandise and has a retail division called The Final Markdown. It also has a wholesale division that sells wholesale closeout items. (See Deposition of Robert Milos dated May 27, 2011, attached to the Affidavit of Suzanne Garrow at attachment 2, "Milos Dep." 10-11.) Robert Milos and Ron Brooks are the current principals of New A.D.E. as well as other individuals who are also affiliated with another closeout chain, Ocean State Job Lots. (Milos Dep. 12.) At all times Mr. Milos has been the President of New A.D.E. (Milos Dep. 14.) Mr. Conforti is the Treasurer of the corporation and has been so at all relevant times. (Secretary of State web page, attached to the Affidavit of Suzanne Garrow at attachment 1.) As president, Mr. Milos has the ultimate power to hire employees of New A.D.E. and its affiliated businesses. (Milos Dep. 15-16.) During all relevant times, Steven Kenniston was New A.D.E.'s Sales Manager. According to him, his job was and continues to be helping sales people to make sales. (See

---

[1] Ms. Newport directs her arguments toward summary judgment on the claims under G.L. c. 148 and 148B. She also requests based on these facts and legal reasoning that the Court find in her favor on Counts II (Quantum Meruit), III (Unjust Enrichment), and IV (Breach of Contract) of her First Amended Complaint.

Deposition of Steven Kenniston dated May 27, 2011, attached to the Affidavit of Suzanne Garrow at attachment 3, "Kenniston Dep." 17.)

It was Mr. Milos who hired Kimberly Newport in or around January 2007. (Milos Dep. 19.)  He hired her as a consultant to replace the employee of the company who was leaving and who had been performing the IT functions of the company. (Milos Dep. 20, 23; Kenniston Dep. 26.)  Ms. Newport met Mr. Milos and Mr. Kenniston through Mr. Kenniston's wife who had worked with Ms. Newport at a prior job. (Milos Dep. 19.)  Although Ms. Newport drafted a proposal for certain work to be done by her at New A.D.E., no contract between her and New A.D.E. was ever signed or executed prior to Ms. Newport beginning work at New A.D.E., or at any time. (Milos Dep. 24-26.)  According to Mr. Milos and Mr. Kenniston she was not hired as an employee, rather she was hired as an independent consultant. (Kenniston Dep. 24, Milos Dep. 25, 26, redacted proposal attached to the Affidavit of Suzanne Garrow at attachment 4; redacted 1099 attached to the Affidavit of Suzanne Garrow at attachment 5.)  From the time she began in the middle of January 2007, until about January 2010, when Mr. Alex was hired to replace her, Ms. Newport was assigned by Mr. Kenniston to sit in the office next to Mr. Kenniston. (Kenniston Dep. 33, 45-46.)  Mr. Milos sat in an office on the other side of Mr. Kenniston. (Kenniston Dep. 56.)  Ms. Newport was provided with a computer, desk, and office supplies by New A.D.E.  (Kenniston Dep. 34, 47.)

Ms. Newport reported to the office each day and also reported to Mr. Milos and Mr. Kenniston when she was going to be late or absent from work. (See e.g. Milos Dep. Exhibits 1, 7, Exhibits to the Robert Milos deposition are attached to the affidavit of Suzanne Garrow at attachment 6; Kenniston Dep. 42, see also e.g. Kenniston Dep. Exhibits. 2, 3, and 5, Exhibits to the Robert Milos deposition are attached to the affidavit of Suzanne Garrow at attachment 7.)  Ms. Newport was

required to "keep the computers running" during business hours. (Milos Dep. 27.) Her replacement, Riju Alex, was also required to "keep the computers running so that we can turn them on and off during business hours." (Milos Dep. 27-29, 83.) As it turned out, Ms. Newport often also worked remotely from home so that she could accomplish all the tasks and duties of her position.  (See e.g. LogMeIn data, attached to the affidavit of Suzanne Garrow at attachment 8.)

While she worked at New A.D.E., Mr. Kenniston had contact with Ms. Newport multiple times each week on a regular and as needed basis and would direct her work at those times. (Kenniston Dep. 55, 77, 110-111.)  Ms. Newport's replacement, Riju Alex, is a current employee of New A.D.E. and reports to Mr. Kenniston. (Kenniston Dep. 35.)  Ms. Newport also reported to Mr. Kenniston, among other people, if she had an issue or problem with her duties or tasks. (Kenniston Dep. 77.) According to Mr. Kenniston, Ms. Newport was responsible for maintaining all forms of communication to and from New A.D.E. (Kenniston Dep. 33.)  Ms. Newport also kept Mr. Kenniston apprised of numerous issues by email. (Kenniston Dep. 79, see e.g. Kenniston Dep. Exh. 4, 7, 8, 10, 11, 12, 15, 16, 23, 28, 31, 32, and 35.)

According to Mr. Milos, it was he who assigned Ms. Newport numerous tasks and duties and directed and controlled Ms. Newport.  Mr. Milos regularly met with Ms. Newport while she worked at New A.D.E. (Milos Dep. 60.)  During her tenure, Mr. Milos assigned Ms. Newport the task of purchasing all computer equipment needed for the company with his approval. (Milos Dep. 31.)  She also purchased the software for the company under Mr. Milos' direction and approval. (Milos Dep. 34, 57.)  She was also assigned the task of finding a facsimile service to send broadcast faxes to the company. (Milos Dep. 32, 69-70, Milos Dep. Exh. 3.)  To do so, Ms. Newport conducted research, ran tests and reported the results of her tests of these services to Mr. Milos who then made the purchasing decision.  (Milos Dep. 36, Milos Dep.

Exh. 3.) Mr. Milos assigned and directed Ms. Newport to do all the routine website maintenance. (Milos Dep. 45, Milos Dep. Exh. 27.) She also chose the web host and was the person at the company to interface with the web host, subject to his approval. (Milos Dep. Exh. 27.) Ms. Newport also worked on website upgrades. (Milos Dep. 67-69.) Mr. Milos and Ms. Newport worked together on this project. (Milos Dep. 69.) Ms. Newport was also responsible for maintaining the facsimile system and the art department computers and file servers and made artistic suggestions regarding ad and website copy. (Milos Dep. 38, 77, Milos Dep. Exh. 9, 18, 28; Kenniston Dep. 33, 71-72.) Mr. Milos also sent Ms. Newport emails regarding website design and content thereby directing her work. (Milos Dep. Exh. 4, 28.)

Mr. Milos assigned Ms. Newport the duty of preparing email promotions to send to customers of New A.D.E., subject to his approval. (Milos Dep. 33.) Ms. Newport was responsible for monitoring and responding to customer emails sent to the company email address with Mr. Milos' direction. (Milos Dep. 40.) She also responded to customer complaints after receiving Mr. Milos' direction and approval. (Milos Dep. 51, 52, 53, Milos Dep. Exh. 14, 19, 20, 22, 23.) She forwarded customer comments and complaints to the appropriate person with Mr. Milos' direction. (Milos Dep. 51, Milos Dep. Exh. 21.) She was also responsible for monitoring a different email address for vendor emails and inquiries and would forward them to Mr. Milos. (Milos Dep. 41, 43, Milos Dep. Exh. 10, 12, 17.) Mr. Milos also assigned Ms. Newport the job of drafting the weekly email coupons and after his changes and approval, sending them to customers. (Milos Dep. 54, 56, 57, see e.g. Milos Dep. Exh. 24, 26.) She also tracked the company's email campaigns for Mr. Milos. (Milos Dep. 54, 56, 57, see e.g. Milos Dep. Exh. 24, 26.) Mr. Milos assigned Ms. Newport the task of researching a new system for gift cards for the retail store. (Milos Dep. 70, 74, Milos Dep. Exh. 30, 33, 34.) She also worked under Mr. Milos' direction to assist

him in selecting a new gift card holder. (Milos Dep. 75, Milos Dep. Exh. 34.)  Ms. Newport was required to compile and print various reports, including reports reflecting the company's inventory, complex sales, and cumulative bookings and provide them to Mr. Milos and others. (Milos Dep. 42-43; See Deposition of Riju Alex dated May 25, 2011, attached to the Affidavit of Suzanne Garrow at attachment 9, "Alex Dep." 71-72.) Ms. Newport was also required to attend a number of trade shows on behalf of New A.D.E., including a show in Las Vegas, and worked with Mr. Milos at a number of those shows. (Milos Dep. 79.)  Also among Ms. Newport's duties were to make purchases for the benefit of New A.D.E.  But anything purchased by Ms. Newport for use at New A.D.E. had to be approved by Mr. Milos. (Milos Dep. 34-35.)

At some point, Mr. Milos believed that the company was outgrowing Ms. Newport's IT abilities and that it needed someone with more education and training in the IT area and began searching for a replacement. (Milos Dep. 81; Kenniston Dep. 97.)  According to Mr. Milos he asked Mr. Kenniston "to begin looking for somebody to replace her." (Milos Dep. 82.)  Mr. Milos decided to hire Riju Alex who began as an employee of the company in or around January 2010. (Milos Dep. 60; Alex Dep. 26, 37.)

Mr. Alex performs virtually the same tasks as were performed by Ms. Newport. He is required to keep the computers "running" and maintains the servers. (Alex Dep. 27, 33.)  He prints monthly sales and inventory reports. (Alex Dep. 27.)  Mr. Alex must respond to retail customer emails. (Alex Dep. 54-55, 59.)  He is responsible for making sure the phones and other forms of communication are maintained. (Alex Dep.55, 69, 70.)  Mr. Alex was also assigned the duty of creating and sending the weekly coupon to customers after Ms. Newport was terminated from New A.D.E.

(Alex Dep. 65.)  He also is responsible for maintaining the facsimile system and the art department computers and file servers. (Alex Dep. 67.)

## III.     SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is appropriate when the relevant pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Pac. Ins. Co. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004) (quoting Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)).

The movant bears the initial burden of proving that no genuine issues of material fact exist for trial.  Lemieux v. City of Holyoke, 740 F. Supp. 2d 246 (D. Mass. 2010) (citing Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000)).  See, Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The First Circuit has defined a "genuine issue of material fact" as that which "possess[es] the capacity to sway the outcome of the litigation under the applicable law."  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (quoting Cadle Co. v. Hayes, 116 F.3d 957 (1st Cir. 1997)).  In deciding a motion for summary judgment, "the court must ask 'whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented."  Riverbank, Inc. v. River Bank, 625 F. Supp. 2d 65 (D. Mass. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 252 (1986) (internal quotations omitted)).  A moving party is entitled to summary judgment if he demonstrates that the party opposing summary judgment has no reasonable expectation of prevailing at trial.  See Price v. General Motors Corp., 931 F.2d 162, 164 (1st Cir. 1991).

## IV.  ARGUMENT

### A.  The evidence demonstrates that Ms. Newport is not an independent contractor but, rather, that she is an employee for purposes of the wage statutes as a matter of law.

Misclassification of employees as independent contractors and the failure to correctly pay those employees as a result of misclassification was finally highlighted in Massachusetts during the work and aftermath of the "Big Dig." This prompted Massachusetts construction industry labor unions to initiate work toward passage of the 2004 amendments to G.L. chapter 149 Section 148B. The language in G.L. chapter 149 Section 148B was ultimately amended to address the misclassification of individuals working at jobs as independent contractors for a number of purposes.  It is noteworthy that this change was equally beneficial to employers as employees because those employers who followed the law, and correctly paid their employees, were at a competitive disadvantage due to the rampant misclassification of employees as independent contractors.  The offending employers who violated the law had employees working at their jobsites without their having to pay them or pay employment taxes, or contribute to unemployment and workers compensation, to name a few abuses.  See Somers v. Converged Access, Inc., 454 Mass. 582, 592-93 (2009).

This misnomer of "contractor" deprived workers of pay and benefits and the amendments to rectify that deprivation were part of a public construction-related bill ("An Act Further Regulating Public Construction in the Commonwealth," Chapter 193 of the Acts of 2004).  While a part of a public construction bill, the amendments changed the definition of independent contractor for all jobs and industries in the Commonwealth.

The amendments were codified in G.L. c. 149 § 148B, which makes clear by its plain language:

>    (a) For the purpose of this chapter and chapter 151, an individual performing any service, except as authorized under this chapter, shall be considered to be an employee under those chapters unless:—
>
>    (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
>    (2) the service is performed outside the usual course of the business of the employer; and,
>
>    (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Under G.L. ch. 149 § 148B a strong presumption exists that any person performing any services for another is an employee unless the employer meets each prong of the three prong statutory test. Somers, 454 Mass. at 589; Athol Daily News v. Board of Review of the Div of Emp't. & Training, 439 Mass. 171, 175 (2003). See also Awuah v. Coverall North America, 707 F. Supp. 2d 80, 82 (D. Mass. 2010); De Giovanni v. Jani-King Int'l, Inc., 262 F.R.D. 71, 84 (D. Mass. 2009).

The amendments to G.L. c. 149 § 148B specifically provided that an individual is an employee for purposes of wage statutes if the employer failed to meet the three part test. To be exempted from strict adherence to the wage act or G.L. chapter 149 § 148, an employer bears the burden of proving that the employee is actually an independent contractor and that the services at issue are performed in the manner set forth in the statute G.L. ch. 149 § 148B. Athol Daily News, 439 Mass. at 175; Silva v. Dir. of the Div. of Emp't Sec., 398 Mass. 609, 611 (1986) (referring to the identical language found in G.L. c. 151A (2)). If an employer fails to establish even one of the three prongs of the independent contractor statute, the services render by the individual constitute "employment" within the meaning of G. L. c. 149 and that

individual must be treated as an employee of that employer for purposes of the wage statute.[2]

The Massachusetts law, G.L. c. 149 § 148B, establishes this inflexible, three-part test that must be met to overcome the law's **presumption** of an employment relationship.  This three-part test is commonly known as the "ABC" test.  The first prong requires that the worker be free from the presumptive employer's control and direction in performing the service he is performing, **both** under a contract and in fact. Second, the service provided by the worker must fall outside the employer's usual course of business. The third prong states that the worker must be customarily engaged in an independent trade, occupation, profession or business of the same type performed. *An Advisory from the Attorney General Chapter 193 of the Acts of 2004 Amendments to Massachusetts Independent Contractor Law, M.G.L. c. 149 sec. 148 2004/2; An Advisory from the Attorney General Chapter 193 of the Acts of 2004 Amendments to Massachusetts Independent Contractor Law, M.G.L. c. 149 sec. 148 2008/1.* (Massachusetts Attorney General Advisories, attached to this Memorandum at attachment 1.)  The employer must provide evidence that the worker meets all three of the statutory requirements. Otherwise, the worker must be deemed an employee for purposes of Massachusetts wage laws.

Neither the employer nor employee's subjective belief that an individual worker is a contractor should be considered by this Court.  See Somers, 454 Mass. 585. For example, an employer's failure to comply with the law by failing to withhold an individual's employment taxes or failing to contribute on behalf of the individual to unemployment compensation, or its failure to provide worker's compensation may not be considered when analyzing whether an employee has been appropriately

---

[2] The individual defendants should also be held individually liable under 149 § 148B (d) that provides, "any entity and the president and treasurer of a corporation and any officer or agent having the management of the corporation or entity shall be liable for violations of this section."

classified as an employee of the employer. G.L. c. 149, § 148B (b); See Somers, 454 Mass. 593.  Similarly, that an individual may believe himself an independent contractor or non-employee is not dispositive, or even relevant to the inquiry.  See Somers, 454 Mass. 593. See also *An Advisory from the Attorney General Chapter 193 of the Acts of 2004 Amendments to Massachusetts Independent Contractor Law, M.G.L. c. 149 sec. 148 2004/2; An Advisory from the Attorney General Chapter 193 of the Acts of 2004 Amendments to Massachusetts Independent Contractor Law, M.G.L. c. 149 sec. 148 2008/1.* (Memo attachment at 1.)

   **B. The evidence demonstrates that plaintiff is an employee of New A.D.E. under the conjunctive three part "ABC" test.**

    1. Freedom from Control

In order for an employer to disclaim an employment relationship with an employee whom it alleges is a contractor or "consultant" as is claimed here, the employer must show that the worker is free from "control and direction" in the implementation and completion of his or her job. G.L. c. 149, § 148B (a) (1).  To be free from an employer's "control and direction" an individual's activities and duties must actually be "carried out with independence and autonomy."  If an individual worker cannot complete a job using only his own strategy or method, rather is he is subject to instruction or direction, he is an employee for purposes of the wage law.  See Commonwealth v. Savage, 31 Mass. App. Ct. 714, 717-18 (Mass App. Ct. 1991); Brigham's Case, 348 Mass. 140 (1964) (worker was employee because the employer "had the right to control employee in the performance of the details of his work.").  A worker is also appropriately classified as an employee if he does not set his own hours of work.  See Somers, 454 Mass. at 582; See also Savage, 31 Mass. App. Ct. at 717-18.

The undisputed facts show that Ms. Newport did not act free from New A.D.E.'s control and defendants cannot show that the plaintiff operated with freedom from control as a matter of law as they must to survive summary judgment.   In, Amero v. Townsend Oil Company, 25 Mass. L. Rep. 115 (Mass. Super. Ct. 2008), a Superior Court judge granted summary judgment in favor of the plaintiff Hughes Amero. He was a truck driver who was classified as an independent contractor by the defendant.  Even though he provided his own truck, formed a corporation, and signed an independent contractor agreement, the court nonetheless found that he should have been classified as an employee for purposes of the wage statutes based on the control exercised by the putative employer.  See Amero, 25 Mass. L. Rep. 115; M.G.L. c. 149, § 148B (a) (1).

In Amero there were at least some indicia of independent contractor status whereas here, none of those indicia were present.  The evidence instead shows that the plaintiff was directed and controlled at every turn in her work at New A.D.E. sufficient to find for Ms. Newport as a matter of law on this factor.  From the time she began in the middle of January 2007, until about January 2010, when Mr. Alex was hired to replace her, Ms. Newport was assigned to her own office at the worksite, using New A.D.E. equipment, tools and supplies.  Her office was next to Mr. Kenniston and very near to the company's President, Mr. Milos.  Ms. Newport reported to Mr. Milos and Mr. Kenniston when she was going to be late or absent from work.

While she worked at New A.D.E., Mr. Kenniston had regular contact with Ms. Newport multiple times each week on an as needed basis and would direct her work at those times. She also reported to him, among other people, if she had an issue or problem with her duties or tasks. Ms. Newport kept Mr. Kenniston apprised of numerous issues by email and he never told her not to do so. But, according to Mr.

Milos, it was he who assigned Ms. Newport numerous tasks and duties and he too regularly met with Ms. Newport while she worked at New A.D.E and directed and controlled her work at that time.

 Among the tasks in which Mr. Milos exerted direction and control over Ms. Newport was that she was expected to "keep the computers running" during business hours.  While it is true that Ms. Newport may have used her own methodology to maintain the computers and servers, she was directed to do so by Mr. Milos and Mr. Kenniston.  Ms. Newport also had many other tasks that were assigned to her but were subject to direction and approval, primarily of the company's President, Mr. Milos.  For example, when she purchased the software for the company it was only with Mr. Milos' direction and approval.  Among Ms. Newport's other duties were to make certain other purchases for the benefit of New A.D.E.  Anything at all that was purchased by Ms. Newport for use at New A.D.E. had to be approved by Mr. Milos.

 Mr. Milos also assigned Ms. Newport the task of finding a facsimile service to send broadcast facsimiles to the company to keep employees apprised of company wide information.  Mr. Milos directed Ms. Newport to research, run tests and report the results of her tests of these facsimile services to him.  As with all other purchases, he then made the decision regarding what service the company would engage.  Mr. Milos assigned and directed Ms. Newport to do all the routine website maintenance. Ms. Newport also worked on website upgrades together with Mr. Milos.  Mr. Milos also sent Ms. Newport emails regarding website design and content and directed her work in that area.

 Ms. Newport was responsible for monitoring and responding to customer emails and complaints after receiving Mr. Milos' direction and approval for those responses. Ms. Newport forwarded customer comments and complaints to Mr. Milos

and he would direct her to whom in the company she should forward the comment or direct her in formulating the company's response.

Another of Ms. Newport's central tasks was to prepare and send promotional material to New A.D.E.'s customers.  Mr. Milos assigned Ms. Newport the duty of preparing weekly email promotions to send to customers of New A.D.E., subject to his continued approval.  She drafted the coupon and forwarded it to him for his changes and approval.  He then directed her to send it to New A.D.E.'s customers.  Mr. Milos also directed Ms. Newport to track the company's email campaigns.

Mr. Milos and Ms. Newport worked together in devising a new system for gift cards in the retail stores.  Mr. Milos first assigned Ms. Newport the task of researching a new system for gift cards for the retail store which he then selected.  She also worked with Mr. Milos in selecting a new gift card holder.

Other tasks assigned to Ms. Newport include that she was required to compile and print various reports including reports reflecting the company's inventory, complex sales, and cumulative bookings to provide them to Mr. Milos and others.  Ms. Newport was also required to attend a number of trade shows on behalf of New A.D.E., including a show in Las Vegas, and worked with Mr. Milos at a number of those shows.

These undisputed facts demonstrate that at no point was Ms. Newport free from supervisory direction and control. Ms. Newport had an office and tools and furniture supplied by New A.D.E. and was expected to work at the company's office to keep the computers running at all times during business.  She also reported to Mr. Milos who was ostensibly and "in fact" her boss when she would be out of work or working remotely for some reason.  Every task or duty she performed was at the behest of Mr. Milos or Mr. Kenniston.  They had clear expectations of what Ms. Newport was supposed to do and she was told, in many cases, how to meet those

expectations. This was so to the point that Mr. Milos micromanaged virtually every task performed by Ms. Newport. Ms. Newport's activities were also almost never "carried out with independence and autonomy" as demonstrated by the evidence. Nor was she able to use her own strategy or method, rather is she was instructed, directed or needed Mr. Milos' approval for nearly every task and was therefore an employee for purposes of the wage law under the first factor of the independent contractor statute as a matter of law.

Also undisputed, there is no contract demonstrating that the plaintiff while working at New A.D.E. was free from supervisory direction or control. According to the Attorney General, a written contract or job description indicating that a worker is free from supervisory direction or control is required to establish independent contractor status; otherwise the worker is an employee as a matter of law. *An Advisory from the Attorney General Chapter 193 of the Acts of 2004 Amendments to Massachusetts Independent Contractor Law, M.G.L. c. 149 sec. 148 2004/2,* page 4*;* (Memo. attachment at 1.); See Rainbow Dev., LLC v. Commonwealth Dep't of Indus. Accidents, 20 Mass. L. Rep 277 (Mass. Super. Ct. 2005) (court found that worker was an employee where he had a contract in which the company asserted that the individual was an independent contractor but which also demonstrated that the company exerted control over the activities of the individual). Even where a worker signed a contract stating that they were an independent contractor, the court held that such a contract is not dispositive as the contract must demonstrate that the worker is in fact free from supervisory control. Fucci v. E. Connection Operating, Inc., 2009 Mass. Super. LEXIS 421 (Mass. Super. Ct. Sept. 21, 2009).

Defendants cannot show that there is a contract or agreement with Ms. Newport demonstrating that she is free from supervisory control by the defendants. As plainly admitted by New A.D.E.'s President, Mr. Milos and by Mr. Kenniston, no

contract was ever signed or executed between the parties at all, a dispositive fact in the analysis militating a conclusion that judgment should enter on all her claims as a matter of law in favor of Ms. Newport.

### 2. Service Outside the Usual Course of Employer's Business

Defendants also cannot show, as a matter of law, that the plaintiff performed a service that is outside their usual course of business. To be deemed an independent contractor, the worker's job or service also must be performed "outside the usual course of business of the employer." G.L. c. 149, § 148B (a) (2). A worker who performs the same type of work that is part of the normal services of the employer must be treated as an employee. See Rainbow Dev., 20 Mass. L. Rep 277; Canning's Case, 283 Mass. 196, 199 (1933).

Under the second prong of the ABC test, anyone who performs work in the "usual course of business" is an employee. Athol Daily News, 439 Mass. at 179. Employees who perform services in the "usual course of business" include art instructors in a museum, Mattatuck Museum-Mattatuck Historical Soc'y v. Adm'r. Unemployment Comp. Act, 238 Conn. 273, 280 (1996) (cited with approval by the Supreme Judicial Court in Athol Daily News, 439 Mass. at 179), musicians performing in a bar, Bigfoot's, Inc. v. Board of Rev. of Indus. Comm'n of Utah, 710 P.2d 180, 181 (Utah 1985), and an organist performing in a funeral home, Yurs v. Dir. of Labor, 235 N.E.2d 871, 875 (1968). According to the SJC, the "usual course of business" includes not just regular and continuous services. Where the enterprise holds itself out or defines its activities as including a service, such as music in a bar, the service should be considered a part of the "usual course of business." Cf. Athol Daily News, 439 Mass. at 179.

Service is also considered a part of "usual course of business," regardless of its substantiality relative to other activities of the enterprise. See Shannon's Case,

274 Mass. 92, 96 (1931) (the work of the employee was a part of the usual course of business (manufacture of cotton goods) where the employer maintained a department for operation of its plant, and construction was a necessary part of the business and not merely ancillary or incidental to the business); Canning's Case, 283 Mass. at 199 (worker was an employee where the employer (rug manufacturer) hired the employee under the direction and control of the superintendent of the factory, although the worker had technical knowledge which the superintendent lacked). Rather, the test is "a worker whose services form a regular and continuing part of the employer's business" should be deemed an employee. Am. Zurich Ins. Co. v. Dep't of Indus. Accidents, 21 Mass. L. Rep. 224 (Mass. Super. Ct. 2006) (relying on Athol Daily News, 439 Mass. at 178-179).

It would be an oversimplification to conclude that because Ms. Newport served as a one person IT department at New A.D.E. which was not a computer company that she served New A.D.E outside the "usual course of business".  Just as in Cannning's Case, the mere fact that Ms. Newport possessed superior technical knowledge to others in the company does not undermine her claim that she was an employee of New A.D.E.

To the contrary, the Court should find that the IT functions were a necessary part of the employer's retail and wholesale business and that Ms. Newport's work was in the "usual course of business" as a matter of law.  Ms. Newport was tasked with maintaining all communication methods to and from New A.D.E. which is a function that is integral to its business.  While she worked at New A.D.E., it was Ms. Newport's job to maintain New A.D.E.'s website, which is also necessary to its business.  Customers and vendors are certainly an important part of a wholesale and retail business.  Ms. Newport monitored and answered email communication with its customers and vendors.  New A.D.E. sent broadcast facsimiles and weekly coupons

via email to its customers which Ms. Newport designed and sent. Ms. Newport compiled, printed and distributed sales and inventory reports which are certainly integral to a retail and wholesale business. At bottom, the Court should conclude that performing all the IT functions of the company, maintaining all forms of communication to and from New A.D.E., communicating with customers and vendors, printing necessary reports and the myriad of other tasks and duties performed by Ms. Newport were services which "form a regular and continuing part of the employer's business" and that Ms. Newport was an employee as a matter of law and summary judgment should enter for the plaintiff.

### C. Independent Trade, Occupation or Business

In order to be deemed an independent contractor the worker at issue must work routinely in an "independently established trade, occupation, profession or business." G.L. c. 149, § 148B (a) (3). The particular service in question must be "similar in nature" to the "independently established trade, occupation, profession or 'business'" of the worker. G.L. c. 149, § 148B (a) (3). "An independent contractor must represent him or herself to the public as 'being in business to perform the same or similar services.'" I.R.S. Revenue Ruling 87-41, Factor 12(c) cited in *An Advisory from the Attorney General Chapter 193 of the Acts of 2004 Amendments to Massachusetts Independent Contractor Law, M.G.L. c. 149 sec. 148 2004/2*. Furthermore, an independent contractor often has a financial investment in a business that is related to the service he or she is currently performing for the employer. I.R.S. Revenue Ruling 87-41, Factor 14. Id. "Ordinarily, an independent contractor has characteristics of an independent business enterprise. See Fair Labor Standards Handbook, Tab 200 ¶ 217, August 1998." *An Advisory from the Attorney General Chapter 193 of the Acts of 2004 Amendments to Massachusetts Independent Contractor Law, M.G.L. c. 149 sec. 148 2004/2*.

The SJC has held that the subsection (c) analysis of the ABC test is as follows:

> The better approach to the evaluation required by part (c) is to consider whether the service in question could be viewed as an independent trade or business because the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.

Athol Daily News,  439 Mass. at 181.

Following the SJC's decision in Athol Daily News, taxi drivers were found to be independent contractors satisfying the third prong where they were free to find customers on their own and reject prospective customers referred from the dispatcher. See Comm'r of the Div. of Unemployment Assistance v. Town Taxi of Cape Cod, Inc., 68 Mass. App. Ct. 426, 432 (2007).  Coverage under the third prong turns on whether the worker can refuse an offered customer, choose to work or not work during the scheduled time of referrals, and can work for other entities during the time the worker may also accept referrals. Id. at 432.

The facts here require a finding that Ms. Newport was an employee as a matter of law.  Analogizing Town Taxi to the instant case, Ms. Newport certainly did not have the option of rejecting work that was given to her by Mr. Milos or Mr. Kenniston.  They were for all intents and purposes her bosses and expected her to do whatever was asked.  With the level of micro-management and the expectations and requirements set by her supervisors Ms. Newport was not free to choose to work or not.  She was clearly under the control of Mr. Milos and Mr. Kenniston and was not an independent tradesperson when working for New A.D.E.  As the evidence demonstrates, Ms. Newport was also unable to work for other entities in any meaningful way, due to the time commitment and all-encompassing job at New A.D.E.  The Court should find that New A.D.E. cannot satisfy the third prong of the

ABC test. The Court should also find that Ms. Newport was an employee as a matter of law and grant summary judgment in her favor.

## V. CONCLUSION

Based on the foregoing the Court should **allow** Plaintiff's Motion Summary Judgment on all counts of her complaint.

PLAINTIFF
KIMBERLY Y. NEWPORT
By her attorney,

　/s/ Suzanne Garrow
Suzanne Garrow BBO# 636548
sgarrow@hfmgpc.com
Heisler, Feldman, McCormick
　　& Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA  01103
Ph. (413) 788-7988
Fax (413) 788-7996

Dated:   July 8, 2011

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF).

　　　/s/ Suzanne Garrow
Suzanne Garrow